Eric E. Holm
Ben T. Sather
SATHER & HOLM, PLLC
1631 Zimmerman Tr., Ste. 2
P.O. Box 22916
Billings, MT  59104
Phone: (406) 534-4387
Fax: (406) 794-0673
eric@satherandholm.com
ben@satherandholm.com
*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION**

| | |
|---|---|
| CINDY CONLEY and TRACEE BURCHELL, | Cause No.: |
| Plaintiffs, | Judge: |
| v. | **COMPLAINT** |
| STOCKMAN BANK, | |
| Defendant. | |

Plaintiffs Cindy Conley and Tracee Burchell, by and through their attorneys of record, Sather & Holm, PLLC, state and allege as follows:

## INTRODUCTION

1. This action is being brought by Plaintiffs Cindy Conley and Tracee Burchell against their former employer, Defendant Stockman Bank,

1

for sex discrimination in violation of the Civil Rights Act of 1964 and the Montana Human Rights Act.

## PARTIES, JURISDICTION AND VENUE

2. Ms. Conley is an individual who at all relevant times has resided in Miles City, Custer County, Montana.

3. Ms. Burchell is an individual who currently resides in Castle Rock, Douglas County, Colorado. At the time of the events described herein, Burchell resided in Miles City, Custer County, Montana.

4. Defendant is a corporation, incorporated under the laws of Montana. It is a citizen of Montana, with its principal place of business in Miles City, Custer County, Montana.

5. This Court has jurisdiction over the subject matter and the parties to this action. Venue is proper in the United States District Court for the District of Montana, Billings Division.

## ALLEGATIONS COMMON TO ALL COUNTS

6. Ms. Burchell and Ms. Conley are former employees of Stockman Bank. At all times during their employment, Ms. Burchell and Ms. Conley performed the duties and responsibilities of their positions at or above expectations.

7. During their employment, Ms. Burchell and Ms. Conley were subjected to a pattern of unwelcome, inappropriate, and offensive conduct of a sexual nature, including but not limited to the following:

    a. Stockman Bank's Miles City branch president, Stan Markuson, made inappropriate sexual comments and jokes to Ms. Conley for many years. One particular instance is when he stood in the doorway of her office, trapping her in her office, and told Ms. Conley in a creepy, flirtatious manner that he would like to see her in a bikini on the beach in Jamaica, where he had just vacationed with his wife and two children.

    b. Following incidents like this, Ms. Conley was told repeatedly by other bank personnel, "That's just how Stan is" and that she would just have to get used to it. Over the course of Ms. Conley's tenure at the bank, she learned that the mentality of the all-male upper management team is that inappropriate sexual and bullying behavior by male employees of the bank has been and currently is tolerated, if not endorsed or laughed at, by upper management, while female employees are required to just deal with such behavior and the consequences.

    c. On December 22, 2011, Ms. Burchell was involved in an incident with Mr. Markuson during a discussion regarding teller safety at a new bank building in Miles City. Ms. Burchell asked Mr. Markuson if

3

he was aware a customer could see the main vault from the walk-up window. Mr. Markuson immediately grew enraged, stepped forward and got in Ms. Burchell's face with his finger pointing at and almost touching her face, towering over and physically intimidating her, and told her she better think very carefully about what she says next. Ms. Burchell was frightened, took a step back, and put her hands in the air fearing he was going to hit her. The next morning Mr. Markuson "head-hunted" for Ms. Burchell, angrily asking other employees where she was. He finally found her and abruptly called her into Ms. Harwood's office, which turned into Mr. Markuson yelling at and physically intimidating Ms. Burchell again over the teller incident. Ms. Burchell reported this incident to the head of the Human Resources Department at the time, Kelly Klem, who told Ms. Burchell that Mr. Markuson could not fire her and asked if Mr. Markuson had apologized, which he did not. Nothing else was done.

    d. On December 10, 2012, AVP BSA/AML Compliance Officer Tami Harwood (Ms. Burchell's supervisor) told Ms. Burchell at work about a recent incident where she ran into Vice President Compliance Director Jeff Flaten in a local bar. Ms. Harwood said Flaten made extremely derogatory comments about Ms. Burchell, including that Ms.

Burchell was "bitchy," and asked how old Ms. Burchell was. Ms. Harwood told Ms. Burchell that Mr. Flaten said other hurtful things about Ms. Burchell that she would not repeat because they would hurt Ms. Burchell's feelings even more. Ms. Harwood said that some of her friends walked away because of Flaten's comments. Harwood told Ms. Burchell that Mr. Flaten "does not like you." Ms. Burchell asked Harwood if she would report it to HR, and Harwood said, "You're not supposed to know. He told me not to say anything, so don't say anything."

    e.  In April 2013, Ms. Harwood told Ms. Conley about the December bar incident in which Mr. Flaten called Ms. Burchell "bitchy," among other more hurtful things, and asked about her age. Ms. Conley told Ms. Harwood it should be reported to HR, but Harwood responded, "Why go to HR, they won't do anything.  We would just lose our jobs."

    f.  During this time, Ms. Conley, Ms. Burchell, and Ms. Harwood had many discussions regarding Mr. Flaten and his behavior, sometimes as frequent as every day or every other day. All discussions ended with a strong recommendation that Ms. Harwood report Mr. Flaten's behavior to Human Resources.

g. In April 2013, Ms. Harwood told Ms. Burchell (and later Ms. Conley) at work about an incident where Ms. Harwood saw Mr. Flaten at a local bar while Ms. Harwood was attending her sister's bachelorette party. Mr. Flaten told the group that Ms. Harwood worked for him and that she was the "naughty" one in the office, in a sexually suggestive way. Later that same night, Mr. Flaten came up to Ms. Harwood and stroked the side of her face with his hand in a sexually suggestive way. Ms. Burchell told Ms. Harwood she needed to put a stop to this now or it would get worse, but Ms. Harwood responded that HR would not do anything and, besides, it happened outside of work. Ms. Harwood's stories of his offensive behavior were now negatively affecting Ms. Conley and Ms. Burchell in the office. Ms. Conley and Ms. Burchell expressed their fear of Mr. Flaten to Ms. Harwood, as they had also noticed him exhibiting bizarre behavior. Ms. Conley told Ms. Harwood again to go to HR.

h. In May 2013, the Compliance Department had a meeting at a local restaurant. Ms. Burchell and Ms. Conley were present at the meeting. Mr. Flaten talked about his excessive alcohol drinking habits, repeatedly gawked at the young female waitress throughout their meal, and made sure to get the waitress' name off the ticket when he paid.

6

    i. In May 2013, Ms. Harwood told Ms. Burchell and Ms. Conley at work about another night she saw Mr. Flaten out at a local bar, where Mr. Flaten asked her and her friends to come home with him to party at his house after the bars.

    j. During May 2013, discussions between Ms. Conley, Ms. Burchell, and Ms. Harwood about Mr. Flaten's behavior turned to concern for their safety. Ms. Harwood told them it was scaring her and creeping her out and that she was concerned about Mr. Flaten's actions because "these are things that a stalker, rapist, or murderer probably starts out doing." Several times thereafter, they walked each other to their cars after work, in large part because they were concerned about Mr. Flaten's aggressively sexualized behavior and what he might be capable of doing to any one of the women in the office. Ms. Conley and Ms. Burchell were extremely disturbed and frightened by Mr. Flaten's actions and told Ms. Harwood they were considering going to HR themselves. Ms. Harwood challenged them from doing so, stating in a more hostile tone that it would not do any good and that nothing would be done. Ms. Conley and Ms. Burchell knew of other instances of female harassment at Stockman Bank where nothing was done, which was confirmed by Ms. Harwood's sentiments.

k. On June 4, 2013, the Compliance Department held a meeting, attended by Mr. Flaten, Ms. Burchell, Ms. Conley, Ms. Harwood, Linda Haker and Brandi Gray. They were also celebrating Ms. Harwood's birthday. At the meeting, Mr. Flaten was completely fixated on Ms. Harwood and asked her in a sexually suggestive way if they should all stand in line to spank her or if they all got to spank her at once. Ms. Harwood appeared shocked and said, "No, there will be no spanking," to which Mr. Flaten responded, "Oh, the spanking will come this weekend."

l. Later in the June 4 meeting, Mr. Flaten stated he was updating the disclosure board's "Reg Double D" and looked around the room with a creepy smirk on his face. While fixating on Ms. Conley's breasts, Mr. Flaten said that "Reg Double D" was his *favorite* regulation, as he motioned his upper body towards Ms. Conley, and that it was easy for him to remember that regulation because its name is "Double D." He then giggled as if proud of himself for saying it. Mortified and heart racing, Ms. Conley covered her face with her hands and turned beet red.

m. Immediately after the "Reg Double D" comment, Mr. Flaten told a crude "blonde joke" directed at Ms. Conley, the point of which was making fun of unintelligent, blonde females. Ms. Conley is blonde, as were most women in the department.

n.  Later on June 4, Mr. Flaten asked Ms. Harwood what she was doing for her birthday and repeatedly suggested in a creepy, sexualized manner that she go to the pools at Chico Hot Springs, because he goes there and really likes it.

o.  In approximately June 2013, Ms. Conley was informed that during a recent Audit Department meeting, Mr. Flaten continuously gawked at and fixated on a female employee from another department in a creepy, flirtatious manner.

p.  On July 1, 2013, Ms. Harwood was standing at her door talking with Ms. Burchell when Flaten walked by, and Ms. Harwood cringed and shuddered. Harwood told Burchell with disgust, "He just winked at me."

q.  Later on July 1, Mr. Flaten announced to some Compliance Department employees, "It's so hot I'm going to take my shirt off." He continued, "I hope no one around here minds my big belly and deep navel." Ms. Burchell and Ms. Conley told Ms. Harwood later that this had gone on long enough and that Ms. Harwood *must* report this to HR. Ms. Harwood said they would not do anything but slap him on the wrist because he is a friend of CEO, Bill Coffee. At this point, Ms. Conley and Ms. Burchell were in constant fear for their safety based on Mr. Flaten's instability and the corporate culture of the Bank. Based on their

experiences, stories about other women harassed at the bank that went unpunished or unreported, and Ms. Harwood's insistence that nothing could be done, Ms. Conley and Ms. Burchell felt frightened and helpless.

  r. Later on July 1, Mr. Flaten stood and lingered at Ms. Conley's office door, staring eerily at Cindy for an uncomfortable period of time, making her feel trapped and isolated in her office.

  s. On July 2, 2013, Ms. Burchell overheard Mr. Flaten telling his assistant, Ms. Gray, a sexual joke about "gay men" and "poop." Ms. Gray appeared disgusted and loudly told him, "I would not repeat that to anyone." Mr. Flaten had told the joke loud enough for those women in the vicinity to hear, as though he enjoyed making them feel uncomfortable and disgusted.

  t. On July 3, 2013, Ms. Harwood told Ms. Burchell that Mr. Flaten just told Ms. Harwood that an email from another female employee was "bitchy" and asked Ms. Harwood, "Is she on her period?" He continued, "Or maybe she is too old to have her period." Ms. Harwood told him, "Stop, I'm not going there," and Mr. Flaten responded, "This department is not politically correct…at least I'm not." Ms. Burchell told Ms. Harwood that this has to stop – that Mr. Flaten is

sick, she was offended by it, and Ms. Harwood needs to report it. Ms. Harwood said the bank would do nothing but a slap on the wrist.

    u. On July 8, 2013, Ms. Burchell again told Ms. Harwood she should report Mr. Flaten.

    v. On July 9, 2013, Ms. Burchell told Ms. Harwood she was very upset about Mr. Flaten's recent inappropriate and disrespectful remarks. Ms. Harwood again said that HR was not going to do anything because Mr. Flaten was a friend of the CEO.

    w. On July 10, 2013, Ms. Conley researched the company's Sexual Harassment Policy herself and emailed portions of it to Ms. Harwood and Ms. Burchell, stating they needed to discuss reporting Mr. Flaten to HR. Later that day, the three discussed the intolerable and unsafe work environment and that they, and especially Ms. Harwood as Ms. Burchell's supervisor, believed they needed to report Mr. Flaten to HR. After some discussion, Ms. Conley and Ms. Burchell stated they themselves were either going to report this to HR or confront Mr. Flaten directly, whether Ms. Harwood joined them or not. Ms. Harwood agreed it should be reported, but she did not think anything would change.

    x. On July 11, 2013, Ms. Conley, Ms. Burchell, and Ms. Harwood all reported to HR the sexual harassment and hostile work environment to

which they had been subjected. Prior to their telephone call to HR, Ms. Harwood told Ms. Burchell she was only going to relate facts, because "feelings don't matter."

    y.  Ms. Burchell was forced to accept a lesser position at a different branch in Billings, to try to escape harassment. Ms. Burchell reported to work as directed in Billings. During that time, co-workers and Ms. Burchell's supervisor inundated her with warnings about Billings Market President, Wayne Nelson. Her supervisor went as far as making Ms. Burchell pull his picture up on Stockman Bank's intranet so she would be aware of what he looks like. Meanwhile, Stockman Bank's solution for Ms. Conley was to have her report directly to Ms. Gray, Mr. Flaten's assistant, so that Ms. Conley would not have to report directly to Mr. Flaten, but Mr. Flaten would remain in the same department and office, located directly across the hall from Ms. Conley's office.

    z.  Stockman Bank admitted Mr. Flaten acted inappropriately by punishing him for his actions; however, the only punishment Mr. Flaten received was a forced apology – which Ms. Conley and Ms. Burchell were not present for – attendance at a two-hour seminar on harassment prevention, and attendance at two EAP counselor sessions. He was not fired, demoted, relocated, or otherwise disciplined. Ultimately, Defendant

failed to properly punish Mr. Flaten, Mr. Markuson, or Ms. Harwood or to otherwise rectify the harassment and hostile work environment that was created and allowed to persist at Stockman Bank.

    aa. When Ms. Burchell relocated to Billings, she asked Stockman Bank to pay for some of her relocation costs. CEO Bill Coffee wrote a letter in response that essentially blamed Ms. Burchell for choosing to move to Billings herself.

    bb. Ms. Conley and Ms. Burchell were forced to undergo professional counseling and other medical treatment as a direct result of Stockman Bank's actions. Separate medical providers have diagnosed each Plaintiff with post-traumatic stress disorder, anxiety disorder, and other diagnoses caused by Stockman Bank's actions. Due to their severe conditions and the fact that nothing has changed at Stockman Bank, Ms. Conley and Ms. Burchell's separate medical providers have not released them to return to work at Stockman Bank, and they were forced to resign from their employment with Stockman Bank.

    8.    Defendant has discriminated against Ms. Burchell and Ms. Conley because of their sex in the form of a hostile work environment. Ms. Burchell and Ms. Conley were subjected to a pattern of ongoing and persistent harassment, and the workplace was permeated with discriminatory

intimidation, that was severe and pervasive enough to alter the conditions of their employment and create an abusive working environment. The workplace was objectively hostile, and plaintiffs perceived it as hostile.

9. The harassment was perpetrated by one or more supervisors, and Defendant is thus liable for the harassment.

10. Plaintiffs' decisions to resign were reasonable under the totality of the circumstances, including their medical providers' orders.

11. As a result of Defendant's actions, Ms. Conley has suffered severe and disabling emotional distress, including post-traumatic stress disorder, high blood pressure, anxiety, panic attacks, sleep disorder, humiliation, and depression. She has been unable to return to work.

12. As a result of Defendant's actions, Ms. Burchell has suffered severe and disabling emotional distress, including post-traumatic stress disorder, panic attacks, sleep disorder, humiliation, depression, and acute anxiety disorder. Ms. Burchell was forced to relocate to a lesser position at a new branch in Billings, Montana, incurring additional losses. Ms. Burchell has been unable to return to work.

13. Plaintiffs exhausted their administrative remedies through the Montana Human Rights Bureau and the U.S. Equal Employment

Opportunity Commission and were granted permission to file suit against Defendant in district court.

## COUNT I – CIVIL RIGHTS ACT OF 1964

14. Plaintiffs reassert each allegation as if fully set forth here.

15. Defendant has violated Plaintiffs' rights under Title VII of the Civil Rights Act of 1964, Title 42, Chapter 21, Subchapter VI, U.S.C., by discriminating against Plaintiffs because of their sex, causing them compensatory and other damages.

16. Defendant has retaliated against Plaintiffs in violation of Title VII of the Civil Rights Act of 1964, Title 42, Chapter 21, Subchapter VI, U.S.C., causing them compensatory and other damages.

## COUNT II – MONTANA HUMAN RIGHTS ACT

17. Plaintiffs reassert each allegation as if fully set forth here.

18. Defendant has violated Plaintiffs' rights under the Montana Human Rights Act, Title 49, MCA, by discriminating against Plaintiffs because of their sex, causing them compensatory and other damages.

19. Defendant has retaliated against Plaintiffs in violation of the Montana Human Rights Act, Title 49, MCA, causing them compensatory and other damages.

**WHEREFORE**, Plaintiffs request relief as follows:

1. That judgment be entered for Plaintiffs and against Defendant;

2. That Plaintiffs be awarded damages for lost past and future wages, benefits, and other pecuniary losses;

3. That Plaintiffs be awarded damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses;

4. That Plaintiffs be awarded punitive damages;

5. That Plaintiffs be awarded their attorneys' fees and costs;

6. That Plaintiffs be awarded interest on all amounts due; and

7. That Plaintiffs be awarded other relief as the Court deems just.

DATED this 2nd day of July, 2014.

> By: /s/ Eric E. Holm
> Eric E. Holm
> Ben T. Sather
> SATHER & HOLM, PLLC
> 1631 Zimmerman Trail, Suite 2
> P.O. Box 22916
> Billings, MT 59104
> Phone: (406) 534-4387
> Fax: (406) 794-0673
> eric@satherandholm.com
> ben@satherandholm.com
> *Attorneys for Plaintiffs*